IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ENTERED

OCT 0 5 2004

U.S. DISTRICT COURT
WHEELING, WV 26003

CHARLES W. JOHNSON,

        Plaintiff,

v.                                    Civil Action No. 3:03-CV-78

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Charles W. Johnson, (Claimant), filed his Complaint on December 8, 2003, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on June 4, 2004.[2] Claimant

filed his Motion for Summary Judgment on July 27, 2004.[3] Commissioner filed her Motion for

Summary Judgment on August 25, 2004,[4] along with a brief in support of her Motion for Summary

Judgement.[5]

B.    <u>The Pleadings</u>

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 7.

[4] Docket No. 8.

[5] Docket No. 9.



1.  Claimant's Motion for Summary Judgment.[6]

2.  Commissioner's Motion for Summary Judgment.[7]

C.  Recommendation

1.  I recommend that Claimant's Motion for Summary Judgment be DENIED because the Administrative Law Judge's decision that Claimant could perform a limited range of medium work is supported by substantial evidence.

2.  I recommend that Commissioner's Motion for Summary Judgment be GRANTED because the Administrative Law Judge's decision that Claimant could perform a limited range of medium work is supported by substantial evidence.

## II. Facts

A.  Procedural History

On June 5, 1996 Claimant filed for disability benefits. On January 29, 1999 an Administrative Law Judge (ALJ) denied his claim. On October 23, 2000 Claimant again filed for disability insurance benefits (DIB) and Supplemental Security Income (SSI) alleging disability since December 1995. Commissioner denied benefits. A hearing was held on September 20, 2002 before an ALJ. The ALJ's decision dated December 27, 2002 denied the claim finding Claimant not disabled within the meaning of the Act. The Appeals Council denied Claimant's request for review of the ALJ's decision on December 27, 2002. This action was filed and proceeded as set forth above.

B.  Personal History

---

[6] Docket No. 7.

[7] Docket No. 8.

Claimant was born on February 27, 1953 and was 49 years old on the date of the September 20, 2002 hearing before the ALJ. Claimant has a high school education and past relevant work experience as a bell ringer for the Salvation Army.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: January 30, 1999 - December 27, 2002.

### 1. Medical Records

**Veterans Administration Medical Records**

Treatment Note, April 22, 1999, Tr. 313

- Chief Complaint: Illegible.

- History: Illegible.

- Findings: Illegible.

- Diagnosis: Diffuse muscle tenderness.

Treatment Note, July 19, 1999, Tr. 209-210

- Chief Complaint: Fibromyalgia.

- Findings: Mild tenderness over the liver and shoulder pain.

- Diagnosis: Elevated CPK, +ANA, and Fibromyalgia symptomology.

- Plan of Treatment: Neurology work up for muscle metabolic disease. Muscle biopsy. Fibromyalgia therapy.

Treatment Note, August 12, 1999, Tr. 304

- Chief Complaint: The Patient stated that he was stiff, sore, and tired.

- Findings: The Patient had tender shoulder girdle muscles, decreased sensation in the lateral left thigh, but showed no signs of muscle wasting in thighs or gluteals.

- Diagnosis: Etiology still uncertain.

- Plan of Treatment: The Patient may require a muscle biopsy if TFTs are negative.

Treatment Note, August 16, 1999, Tr. 202

- Chief Complaint: Sleep apnea and muscle ache.

- Examination: The Patient was tested for possible muscle myopathy.

- Findings: There was no drift and no tremor, bulk and tone were normal, and strength was full throughout.

- Diagnosis: The Patient continues to suffer from sleep apnea. The cause of the muscle pain cannot be diagnosed until the results of the biopsy are reviewed.

- Plan of Treatment: The Patient will have a muscle biopsy. The Patient was also encouraged to use CPAP mask as directed for his sleep apnea.

Treatment Note, May 10, 1999, Tr. 229

- Chief Complaint: Back and thigh pain.

- History of Present Illness: The Patient is a 46 year old man with intermittent lower back pain, often spontaneous in nature, with radiation into the right thigh.

- Examination: Spine LS Bending Min (4 views)

- Findings: There is normal position and alignment of the vertebral column. The vertebral bodies, intervertebral disk spaces, pedicles and processes are intact.

- Impression: Patient is capable of walking 1–2 miles without significant pain or severe swelling or cramping and shows no sign of a loss of bulk/power.

- Diagnosis: Working diagnosis of Fibromyalgia/OSA. The pictures of the Patient's back show an essentially normal lumbosacral spine.

Treatment Note, September 21, 1999, Tr. 228

- Chief Complaint: Muscle pain.

- History of Present Illness: The Patient is a 45 year old male with intermittent proximal

muscle pain and elevated CK.

- Examination: Left shoulder muscle biopsy.

- Findings: Microscopic sections demonstrate skeletal muscle with mild variation in fiber size and configuration and occasional atrophic fibers. There is no evidence of active fiber degeneration, regeneration, inflamation, vasculitis, or fibrosis. Oxidative enzyme stains reveal no abnormalities of the intermyofibrillar network. Glycogen is present in the usual amount and distribution.

Treatment Note, October 18, 1999, Tr. 196

- Chief Complaint: Fibromyalgia.

- History of Present Illness: The Patient suffers from several active and verified ailments including benign hypertension, fibromyalgia, obesity, sleep apnea, and chest pain.

- Findings: The Results of the muscle biopsy indicated that the patient's muscle tissue was completely normal.

- Diagnosis: Fibromyalgia and sleep apnea.

- Plan of Treatment: The Patient will be scheduled for a MHC consultation and will not change his meds.

Rheumatology Treatment Note, November 18, 1999, Tr. 194

- Chief Complaint: Fibromyalgia.

- History of Present Illness: The Patient is a 46 year old male with a history of diffuse muscle pain, chest pain, and sleep apnea.

- Impression: The Patient presented with diffuse muscular pain on the occipital area, trapezious, deltoid, anterior chest, thigh, and hip bilaterally.

- Findings: There was no evidence of muscle weakness or numbness and no significant joint pain, but there was evidence of diffuse muscle pain.

- Diagnosis: Generalized muscle pain.

- Plan of Treatment: A treatment called transcranial nerve stimulation was suggested but the Patient refused. The Patient will continue on his current meds.

Treatment Note, March 31, 2000, Tr. 288

- Chief Complaint: Pain in the lower right rib cage and upper right abdomen.

- Impression: The Patient is not suffering from diarrhea or loss of appetite. The Patient did state that he had recently quit his medication.

- Plan of Treatment: The Patient was instructed to resume his medication and go to the emergency room if the pain got any worse.

Treatment Note, April 4, 2000, Tr. 284

- Chief Complaint: Routine checkup.

- History of Present Illness: The Patient has a history of elevated CPK of undetermined significance and multiple complaints of pain not easily categorized.

- Impression: In this routine checkup the patient stated that he had not been feeling well, but he could not describe why.

Treatment Note, May 9, 2000, Tr. 270

- Chief Complaint: Recurrent mild epigastric pain.

- History of Present Illness: The Patient is a 47 year old man with a history of chronic abdominal pain, gerd, and hypertension.

- Impression: The Patient denies any vomiting, diarrhea, fever, or dysuria.

- Plan of Treatment: The Patient will continue on Atenolol.

Treatment Note, July 1, 2000, Tr. 253

- Chief Complaint: Primary Care–Annual Psychological Screening.

- Impression: The Patient reported feeling depressed for more than one day in the past week, for more than two weeks in the past year, and for more than two years in his life.

- Diagnosis: The test is positive for a mood disorder.

Rheumatology Treatment Note, August 31, 2000, Tr. 185

- Chief Complaint: Fibromyalgia.

- Findings: The Patient rises from a chair with some help from his upper body and has some difficulty squatting.

- Diagnosis: Fibromyalgia.

- Plan of Treatment: The Patient needs regular exercise. His meds will not be altered.

Treatment Note, October 12, 2000, Tr. 242

- Chief Complaint: The Patient complained of pain in his right hip, back, chest, and ear. The Patient also stated that he was having trouble sleeping.

- History of Present Illness: The Patient is a 47 year old male with a history of hypertension and multiple complaints of pain.

- Plan of Treatment: The Patient will continue on his previously prescribed medication and will take a stress test as soon as his blood pressure permits.

Rheumatology Treatment Note, October 26, 2000, 179

- Chief Complaint: Fibromyalgia.

- History of Present Illness: The Patient was scheduled for physical therapy but postponed due to concern over his chest pain. The Patient received an evaluation from cardiology but they concluded that the chest pain was not cardiac related.

- Findings: There is no evidence of strength deterioration.

- Diagnosis: Fibromyalgia.

- Plan of Treatment: The Patient will start effexor 70mg and will be provided with an aerobic exercise routine. Cognitive/Behavioral therapy may also be necessary.

Treatment Note, May 9, 2001, Tr. 212

- Chief Complaint: Routine visit–back pain.

- History of Present Illness: The Patient is a 48 year old male with a history of hypertension, elevated cPK, and multiple complaints of pain not easily categorized.

- Impression: The Patient complains of quick, sharp pains in his lower back that radiate into his groin and cause nausea. The Patient stated that when the pain comes he has

difficulty walking.

- Diagnosis: Not given.

- Plan of Treatment: Urinalysis, sed rate, and cbc.

## 2. Non Treating Physicians

**Mary Anne Schoaff**

Physical Residual Functional Capacity Assessment, December 19, 2000, Tr. 134-141

- Chief Complaint: Diffuse muscle pain, sleep apnea, chest pain, and obesity.

- History of Present Illness: The Patient has a history of fibromyalgia, chest pain, obesity, and sleep apnea–all diagnosed and treated by the VA.

- Findings: The Patient was found to suffer mild exertional limitations on actions including sitting, standing, and lifting.

- Diagnosis: The primary diagnosis is myalgia and the secondary diagnosis is sleep apnea.

**Fulvio Franyutti, M.D.**

Physical Residual Functional Capacity Assessment, May 22, 2001, Tr. 486- 493

- Chief Complaint: Diffuse muscle pain, sleep apnea, chest pain, and obesity.

- History of Present Illness: The Patient has a history of fibromyalgia, chest pain, obesity, and sleep apnea–all diagnosed and treated by the VA.

- Findings: The Patient was found to suffer exertional limitations on certain actions including sitting, standing, and lifting and postural limitations on certain actions including stooping, kneeling, crouching, and crawling.

- Diagnosis: The primary diagnosis is fibromyalgia and the secondary diagnosis is obesity.

D.    Testimonial Evidence

## 1. Claimant

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 514-16,

8

518-20):

Q      When was the last time you worked?

A      The last time I worked, it was this past Christmas season, the Salvation Army.

Q      And what did you do, and how long did you work there?

A      Well, I was a bell ringer.  It usually starts in the, the middle of November, about the middle of November to Christmas Eve or whatever Christmas Eve would fall on.  We worked until Christmas Eve, and sometimes it's not exactly Christmas Eve.  But this past, it was Christmas Eve.

Q      Well, when was the job - - what was the job that you had before that?

A      Bell ringer.

Q      Was that the previous Christmas?

A      (No audible response.)

Q      Have you done - - you have to answer yes or no.

A      Oh.  I'm sorry.  Yes.

Q      Did you have any other job in the past 15 years?

A      Okay.  From 1995, December of 1995, until this past December has just been bell ringing.

*          *          *

Q      Tell me why you feel as though you can't work.

A      Well, there's - -

Q      Well, first let's start with your hypertension.   You have, you have - - the file reflects you have hypertension.

A    Yes. Yeah.

*          *          *

Q    How does hypertension affect you?

A    Well, lately - - well, since - - I'm going to say, since December, as an example, December to now I've been going through a lot of - - and I don't know if it's actually the hypertension doing it, but there's been more chest pains and - -

Q    How often do you have chest pains?

A    This goes - - this, this, this goes on through most of the day. I mean, it's like a coming and going thing, and - -

Q    Are there times when it's worse than other times?

A    Yes, it is.

Q    And what would those times be that cause increased pain?

A    They just, they just come. I mean it's - -

Q    You mean, you, you - - it comes to you either - - whether you're at rest - -

A    Um-hum.

*          *          *

Q    The file also reflects that you suffer from fatigue. Could you tell me about that?

A    Yeah. It's - - I get very tired, to fight against almost constantly.

Q    That fatigue is with you all the time?

A    Yeah. I mean, now sometimes - - there are some days I'm not, not as, you know, fatigued. Then - - but most of the time it, I mean, it's just - - it'll just hit, you know, and - -

Q    The file reflects you also suffer from sleep apnea. Can you tell me about that?

10

Have your sleep - - is your sleep affected?

    A     Yes, because - -

    Q     Is that a nightly occurrence?

    A     Yeah. It's, it's, it's, it's a verbal thing, too.

    Q     How many hours of sleep do you generally get in a night?

    A     I might - - if I'm lucky, I might get two to three.

    Q     Is - -

    A     Sometimes that's - -

    Q     Is that with medication or without medication?

    A     I'm not taking any medication right now. They've tried - -

    Q     I mean for sleep? You're not taking any medication for sleep?

    A     No. In fact, we tried different things, antidepressants, and they didn't work. They just made me more tired, if anything. Or sick, more sick feeling and - -

    Q     Do you have arthritis also?

    A     Well, it would feel like arthritis, but fibromyalgia, you know, it's - -

    Q     Well, how does that affect you?

    A     Fibromyalgia? It, it makes me feel like I have real bad arthritis at times, but - - stiffness.

    Q     Where?

    A     The fingers, you know, wrists and the hips, legs, arms, lower back, sometimes just my back (INAUDIBLE).

    Q     Well, you said stiffness. Is that also pain?

A        Yeah, it's pain and - - pain and stiffness.

                    *              *              *

Q        Do you suffer from depression also?

A        It's not - - I guess it's more - - sometimes I get depressed because of the way I feel, and, and - -

E.       Lifestyle Evidence

The following evidence was obtained through medical records and at the hearing concerning the Claimant's lifestyle. This information is included in the report in order to better understand how the Claimant's alleged impairments affect his daily life.

- Able to work ringing a bell for the Salvation Army annually from Mid November to Christmas Eve (Tr. 514).

- On an average day able to walk a block (Tr. 521).

- Able to sit between a half hour to an hour (Tr. 522).

- Able to stand between a half hour to an hour (Tr. 522).

- Able to lift about eight pounds (Tr. 522).

- Climbs up and down a flight of stairs about four times a day (Tr. 523).

- Can read and write (Tr. 523).

- Able to go to the bathroom (Tr. 525).

- Able to get dressed (Tr. 525).

- Watches television (TR. 527).

- Able to sweep (Tr. 527).

- Able to go shopping (Tr. 527).

12

- Makes own bed (Tr. 527).

- Driven a car twice in a year (Tr. 527).

- Takes the bus (Tr. 529).

- On December 29, 1997 weighed 243 pounds (Tr. 21).

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that his financial situation has deteriorated since the hearing. Also, Claimant maintains that the ALJ erred when he relied on factual errors in his decision. Additionally, Claimant contends that the ALJ erred when he failed to provide a Vocational Expert (VE) at the hearing. Furthermore, Claimant maintains that the ALJ erred when he failed to reopen his previous claim.

Commissioner counters that the ALJ's decision is supported by substantial evidence. Specifically, the Commissioner contends that the ALJ did not base his determination of Claimant's disability on the asserted factual error.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250; <u>see also Charbonnage DeFrance v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979) (holding that summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law"). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

     2.    <u>Dismissal: Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u> 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

     3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

     4.    <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. United States</u>

14

Dep't of Health and Human Services., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

     5.    Disability Prior to Expiration of Insured Status - Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

     6.    Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary. Hayes v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

     7.  Social Security - Scope of Review - Weight Given to Relevant Evidence. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

     8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

     9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled, the

Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Evidence - Weight. The ALJ is required to indicate the weight given to all relevant evidence. Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984). However, the ALJ is not required to discuss every piece of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).

11.    Pro Se Litigant. A pro se litigant is entitled to a liberal construction of his pleadings. Haines v. Kerner, 404 U.S. 519 (1972). See also Miller v. Barnhart, No. 02-2394, 2003 U.S. Dist. LEXIS 7549, at *2 (4th Cir. Apr. 22, 2003).

12.    Social Security - Pro Se Claimants. While a lack of representation does not automatically indicate that a hearing was not fair, the ALJ has a heightened duty in cases involving pro se claimants to develop the record. The Fourth Circuit has held that when a claimant is not represented, the ALJ is under a heightened duty to ensure that all of the facts in a case are fully explored, and that a failure to perform this duty may result in prejudice to the claimant and require a remand. Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981); Sims v. Harris, 631 F.2d 26, 27-28 (4th Cir. 1980).

13. Vocational Expert not Required. "The purpose of bringing in a vocation expert is to assist

the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

14. Res Judicata. "Res judicata precludes the assertion of a claim after a judgment on the merits in a prior suit by parties or their privies based on the same cause of action. Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991). See also Aliff v. Joy Mfg. Co., 914 F.2d 39, 43-44 (4th Cir. 1990) (noting that claims precluded by res judicata include those that existed at the time of the first suit and might have been offered in the same cause of action). "To the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force." Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 476 (4th Cir. 1999).

C.  Discussion

Claimant appears *pro se*. Although still held to the same standards as a Claimant represented by counsel a *pro se* litigant is entitled to a liberal construction of his pleadings. Haines v. Kerner, 404 U.S. 519 (1972). See also Miller v. Barnhart, No. 02-2394, 2003 U.S. Dist. LEXIS 7549, at *2 (4th Cir. Apr. 22, 2003). While a lack of representation does not automatically indicate that a hearing was not fair, the ALJ has a heightened duty in cases involving *pro se* claimants to develop the record. The Fourth Circuit has held that when a claimant is not represented, the ALJ is under a heightened duty to ensure that all of the facts in a case are fully explored, and that a failure to perform this duty may result in prejudice to the claimant and require a remand. Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981); Sims v. Harris, 631 F.2d 26, 27-28 (4th Cir. 1980).

## 1. Change of Financial Circumstance

In his *pro se* letter Claimant wrote to tell the Court about his change in income. Claimant does not cite any legal authority that shows a change in financial circumstance as grounds for appealing the decision of the ALJ. As unfortunate as Claimant's financial situation is this Court is not aware of any legal precedent which holds a change of financial circumstance a factor in reviewing the decision of the ALJ.

## 2. Factual Errors

The Claimant contends that the ALJ's decision had multiple errors that call into question the accuracy of the ALJ's decision. Specifically, the Claimant argues that any and all work done by Claimant between 1989 and January 20, 1995 was not done at the Rescue Mission. Also, Claimant maintains that he did not perform any odd jobs at the Mission. Lastly, Claimant asserts that he did not live in a second floor apartment at the rescue mission. In response, Commissioner asserts that the ALJ properly determined that Claimant was not disabled and that the ALJ did not base his disability determination on Claimant's ability to perform job functions at the Mission.

The ALJ noted that the Claimant worked part-time at the mission where he lived. (Tr. 20). The ALJ stated that the source of this information was a January 24, 1995 treatment record where the Claimant stated he was doing odd jobs at the rescue mission where he lived. (Tr. 20). Claimant asserts in his letter that any work done by him between 1989 and January 20, 1995 was not done at the rescue mission and that no odd jobs were done by him at the rescue mission. In the beginning of his decision the ALJ stated that he is unable to consider a of period of disability prior to January 30, 1999 since a previous January 29, 1999 decision ruled that Claimant was not disabled. (Tr. 19). That was appropriate according to the principles of res judicata. Accordingly, the ALJ should not have

18

used a January 24, 1995 statement made by Claimant to determine the period of disability that is in question in this case January 30, 1999 to December 27, 2002. The question now is whether using the January 24, 1995 statement had an effect on the ALJ denying Claimant benefits. The ALJ used the January 24, 1995 statement in listing the Claimant's work activities in order to determine whether Claimant's work activities rose to the level of substantial gainful activity. The ALJ determined that it did not and therefore did not stop the sequential evaluation process, therefore noting that the Claimant had done some odd jobs around the rescue mission did not effect the ALJ's decision in a way that hurt the Claimant. It should be noted that at the hearing Claimant testified that he used to do some work around the mission:

> Claimant: I used to do some work around the mission, to try, you know, what I could do or if I could tolerate it, but lately I just haven't been doing it. I just – – it's chore work. It's not something that's you know, get paid. It's just chore work. They kind of want to keep you busy, you know, they – –
> ALJ: Now, at where you're staying, are you required to do any work, or do you have any chores to do, or do you do any chores?
> Claimant: Well, they, they give you some chores.
> ALJ: What do you do:
> Claimant: I mean, they assign you – –
> ALJ: What do you do?
> Claimant: I would – – I used to, like, maybe sweep, sweep, you know, sweep around a little bit, and –
> ALJ: Do you make your bed?
> Claimant: Yeah. Yeah.

In his decision the ALJ stated that the Claimant lives on the second floor of an apartment complex and climbs the stairs at least four times a day. (Tr. 26). Claimant asserts that ALJ wrongly assumed that Claimant lived on the second floor in an apartment at the rescue mission. The transcript from the hearing states the following:

> ALJ: Where you're living, is that a house or an apartment?
> Claimant: Well, it's a shelter.

19

ALJ: Shelter.

Claimant: It's a rescue mission, yeah, a shelter.

ALJ: Are you living on the first floor of the shelter?

Claimant: No, it's – – well, where I sleep at is, you know, it's the second level.

ALJ: Second floor?

Claimant: Um-hum.

ALJ: How many times a day do you climb the steps?

Claimant: As less as I have to.

ALJ: I don't know what that means.

Claimant: Yeah, I know, Judge. That's 20 – – if I don't forget anything, once I come – – then I have to – – once I come back and go back up and take my second dose of medicine, it may be, maybe four times, and, and I dread it.

(Tr. 522-23). During the hearing the Claimant clearly stated that he lived on the second level at the rescue mission and went into detail about how many steps he climbs up and down and how many times a day. The ALJ did not wrongly assume that Claimant lived on the second floor as Claimant suggests. The ALJ heard the Claimant testify to such facts under oath during the hearing.

### 3. Lack of Vocational Expert

During the hearing the Claimant asked why a vocational expert (VE) or specialist was not at the hearing. The ALJ responded that he decided that he did not need a VE. The ALJ noted that a VE was present at the previous hearing.

"The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996). "[R]equiring the testimony of a vocational expert is discretionary." Hall v. Harris, 658 F.2d 260, 267 (4th Cir. 1981).

Since having a VE at the hearing is within the ALJ's discretion, no error was made when the ALJ decided not to have one.

### 4. Res Judicata

At the end of the hearing the Claimant stated that he wanted to reopen his old claim. Specifically, Claimant stated that his purpose in filing this claim was to reopen the first one. The ALJ responded that since Claimant did not appeal his first case and three and a half years have passed since, that decision is final.

"Res judicata precludes the assertion of a claim after a judgment on the merits in a prior suit by parties or their privies based on the same cause of action. Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991). See also Aliff v. Joy Mfg. Co., 914 F.2d 39, 43-44 (4th Cir. 1990) (noting that claims precluded by res judicata include those that existed at the time of the first suit and might have been offered in the same cause of action). "To the extent that a second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits, the customary principles of [claim] preclusion apply with full force." Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473, 476 (4th Cir. 1999).

Unfortunately for Claimant the principles of *res judicata* prevent the reopening of his previous claim.

### IV. Recommendation

For the foregoing reasons, I recommend the Plaintiff's Motion for Summary Judgment be DENIED, and that the Defendant's Motion for Summary Judgment be GRANTED.

Any party who appears pro se and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear pro se and any counsel of record, as applicable.

DATED: September _____, 2004
October 5

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE